(No. 13306.—Reversed and remanded.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, vs. MARTHA HOLTZ et al. Plaintiffs in Error.

*Opinion filed June 16, 1920—Rehearing denied October 8, 1920.*

1. CRIMINAL LAW—*conviction cannot be sustained by mere presence of defendants and opportunity to commit the crime.* Proof of mere presence and an opportunity to commit the crime charged is not sufficient to justify a conviction even though the defendants are unable to show who did commit it, but the burden still rests upon the prosecution to show, beyond a reasonable doubt, that the crime was actually committed by the defendants and not by some other person.

2. SAME—*when proof of motive is material.* Proof which establishes guilt beyond a reasonable doubt is sufficient without proof of motive, but the presence or absence of a motive which would lead the defendant to commit the crime is material and important in determining whether he did, in fact, commit it, where the evidence of guilt is entirely circumstantial.

3. SAME—*proof of motive is not, alone, sufficient to sustain a conviction.* Proof of motive, though competent, is not sufficient to sustain a conviction unless a consideration of all the evidence convinces of the truth of the charge beyond a reasonable doubt.

4. SAME—*existence of insurance policies and joint ownership of property do not show motive for murder.* Where two women are charged with the murder of the husband of one of them during a shooting in which the husband of the other was wounded and which they cannot explain except by the presence of burglars in the house, the existence of insurance policies on the lives of the husbands, in which the wives are, respectively, beneficiaries, and the fact that one of the wives was joint owner with her husband of the home in which both families lived, do not, alone, show a motive for the crime.

5. SAME—*what is necessary to conviction upon circumstantial evidence.* It is essential to a conviction upon circumstantial evidence that the facts proved be not only consistent with the defendant's guilt, but that they be inconsistent with his innocence upon any reasonable hypothesis.

6. SAME—*husband or wife cannot testify for a co-defendant if the testimony affects the defendant wife or husband.* Where a wife or husband is indicted with another defendant the respective husband or wife cannot testify for said other defendant if the testi-

mony concerns or directly affects the defendant wife or husband, but where the grounds of defense are several and distinct the husband or wife of one defendant may testify for another as to any matter bearing exclusively upon such other.

7. SAME—*what is necessary to prove a conspiracy—circumstantial evidence.* To prove a conspiracy there must be evidence of some agreement or some joint action toward accomplishing the object of the conspiracy, but, like any other fact, it may be proved by circumstantial evidence.

·8. SAME—*subsequent conduct will not make defendant responsible as a conspirator for acts already done.* Subsequent acts or words will not make a defendant a conspirator and responsible for acts already done without her knowledge; nor will knowle ., e of the crime and subsequent conduct make the defendant responsible as an accessory for its commission but will only tend to establish responsibility as an accessory after the fact.

CARTWRIGHT, C. J., and THOMPSON, J., dissenting.

WRIT OF ERROR to the Circuit Court of Vermilion county; the Hon. A. A. PARTLOW, Judge, presiding.

ACTON & ACTON, S. F. SCHECTER, and LINDLEY, PENWELL & LINDLEY, (WILLIAM M. ACTON, and WALTER C. LINDLEY, of counsel,) for plaintiffs in error.

EDWARD J. BRUNDAGE, Attorney General, JOHN H. LEWMAN, State's Attorney, SUMNER S. ANDERSON, and SAMUEL LEVIN, for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

About four o'clock in the morning of August 9, 1919, the sound of two shots, one following the other at a short interval, was heard proceeding from the second story of a dwelling house at No. 11 McVey street, in the city of Danville. The first shot wounded Charles Holtz and the second killed Walter Whisman. The grand jury at the October term of the Vermilion county circuit court indicted Martha Holtz, the wife of Charles Holtz, and Grace Whisman, the widow of Walter Whisman, for the murder of Whisman. They were tried at the same term and found guilty. They

were sentenced to imprisonment in the penitentiary, Mrs. Holtz for twenty years and Mrs. Whisman for fourteen years, and have sued out a writ of error.

The scene of the tragedy was the residence of Charles Holtz, where he had resided with his wife for eleven years. They had been married for twenty-six years, during which time he had been employed as a motorman, first at Champaign and after their removal to Danville by the Illinois Traction System. Mrs. Holtz was forty-seven years old. The title to the property, which was worth about $6000, had been in Holtz, but on March 16, 1919, he and his wife conveyed it to Anna E. Smith, who on the same day conveyed it to Holtz and his wife as joint tenants and not as tenants in common. Mrs. Holtz was an aunt of Grace Whisman, the sister of her mother, Mrs. Sexton, who lives at West Lebanon, Indiana. Mrs. Whisman was twenty-nine years old and had lived with Mr. and Mrs. Holtz from the time she was nine years old until her marriage to Walter Whisman, five years before his death. She was a stenographer and had been employed by the Burroughs Adding Machine Company in its office at Danville for several months prior to August 9, 1919. Her husband was assistant manager of the Savoy Hotel. They lived in Danville after their marriage, keeping house in rented apartments until November, 1918, when they gave up housekeeping and rented a room in the Holtz house, in which they afterward lived. This was the southeast corner room in the second story, and immediately north of it was the northeast corner room, which was the bed-room of Mr. and Mrs. Holtz. These four were the only occupants of the house. The Whismans did not board at the Holtz house, except that Mrs. Whisman had breakfast there. His hours at the hotel were from seven in the morning to seven in the evening, and hers at the office from 8:30 in the morning to five in the evening. Their meals at noon and in the evening they got at various restaurants, having them together when it was

convenient to do so. His salary was $125 a month, hers $17 a week, and they kept separate bank accounts.

McVey street is a short unpaved street of one block, running west from Gilbert street to Logan avenue. The Gilbert street bridge crosses the Little Vermilion river immediately south of the Gilbert street intersection. On the north side of McVey street are six dwelling houses, of which the Holtz house is the second from the east. The house at the west end of the street was occupied by M. B. Grimes, a deputy sheriff, and his family. This house is about 140 feet west of the Holtz house. The street slopes to the west and at Logan avenue is about three feet lower than at Gilbert street. The south side of the street is also somewhat lower than the north side, and from Gilbert street west for some distance past the Holtz place there is a brick retaining wall, which extends two or three feet above the street. On the south side of this wall it is six or eight feet down to the ground, which slopes south to the river, and the ground between the street and the river is occupied by an orchard. There is a cinder walk on the south side of the street and a cement sidewalk on the north side. On the north side the lots are two or three feet above the sidewalk and steps lead up from the sidewalk to each of the houses. The lots are 150 feet deep, and on the north of them is an alley extending from Gilbert street to Logan avenue. On the north end of the Holtz lot is a garage. On the south side of the Holtz house was a porch, extending across the whole front. The door was near the southwest corner and opened into a hall about twelve feet long. The stairway started up about eight feet from the door, going to a landing on the west side of the hall and then turning east the rest of the way. At the right was a room with a wide opening from the hall, which was the southeast room of the house. There was a light in this room at half-past three o'clock in the morning and at the time of the shooting. Back of the hall and front room was the dining room, and beyond that

on the north was the kitchen. North of the kitchen was a platform which had no roof over it, with several steps leading up to it. The stairway landed at the second story, opposite a doorway which was the entrance to the southeast room, which was the one occupied by Mr. and Mrs. Whisman. There was a small room in the southwest corner of the house. The hall extended north, and next to the entrance to the Whisman room was a door opening into a closet. Beyond that was a door opening into the southwest corner of the bed-room which was occupied by Mr. and Mrs. Holtz, in the northeast corner of the house. At the end of the hall was a door opening into a small room, which was the northwest room of the house, and on the west side of the hall, before reaching that room, was the bath-room. In the southeast room the bed in which Mr. and Mrs. Whisman slept was located in the southwest corner, with the foot pulled out from the west wall a short distance. At the foot of the bed was a table, and above that was an electric light hanging from the ceiling by a cord. On the east side of the room was a box or couch. In the northeast corner was a door opening into a closet. In the northeast room the bed stood in the northeast corner of the room, with the foot pulled out a short distance from the north wall. There was a window in this north wall directly opposite the foot of the bed. The foot of the bed was used as the head, so that when occupied the heads of the sleepers were toward the west. The door from the hall opened into the room in the southwest corner, opening toward the south. North of this door, against the west wall, stood a chiffonier about five feet high. At the top, on the north end, was a medicine closet and on the south end two small drawers. Below these was a large drawer the full length of the chiffonier, about three feet. In this drawer was a loaded 38-caliber revolver belonging to Holtz.

The first person from outside the house on the scene after the shooting was Grimes, the deputy sheriff. He was

awakened about 4:15 o'clock and soon after heard a single shot. Very soon after, his alarm clock, which was set for 4:15, sounded. The alarm was short, and just after it stopped he heard someone screaming and calling for help. He was sleeping in the north part of the house, up-stairs. He looked out of the window, saw someone at the north end of the house and asked what was the matter. Mrs. Holtz answered, telling him who she was, saying that there were burglars up there and there was shooting; that Charlie was shot and she was afraid that Walter was hurt. When he went down-stairs and out the front door Mrs. Holtz asked him to call the police, and he went back to the telephone and did so. He then started to Holtz's house with a revolver in each hand, going pretty fast. Mrs. Holtz was talking to his wife. He went a short distance when he saw a shadow, and Mrs. Whisman stepped out on the sidewalk. He asked her what was the trouble, and she said there were burglars in the house and there was shooting, and asked him not to go up for he might get hurt and she might be the only one that got away. When he got to the Holtz house the porch was dark and the door was open. He heard a noise from the inside of the house and thought it was a burglar. He stood at the east side of the door with his revolvers in his hands. He saw a hand reach out from the inside of the house and turn on the porch light and then saw Holtz standing with his hands to the back of his head and his eyes staring. He was staggering and asked Grimes who he was and what he wanted. Grimes told him who he was and that he had come to see what the trouble was and if he could be of any help. Holtz said, "If you will get the women to go to bed and be still there will be no trouble; I am shot." He turned around and walked up against the newel post. Grimes asked him where Walter was, and he said he did not know. Grimes then went up-stairs. When he reached the landing he noticed that Mrs. Holtz was with her husband, caring for him, and

when he got to the top of the staircase Mrs. Whisman was a step or two behind him and asked him not to go any further for he was likely to get hurt. He asked her which was their room, and she pointed to the southeast room as their room and the northeast room as the Holtz room. Grimes first looked into the small southwest room and saw no one. He then went into the Whisman room and first went to the closet in the northeast corner and opened the door but found no one. He looked toward the bed and saw bare feet and a body and a gown with blood on it. It was Whisman, who was lying on his back with his head close to the baseboard of the south wall, with his feet almost under the bed and his shoulders eight or ten inches from the head of the bed. Grimes took hold of his hand and felt his fingers work. He thought Whisman was alive but could not feel any pulse. His face was moist and blood was still bubbling from the wound in his breast. As Grimes started out of the room he met Mrs. Whisman at the door and she asked if Walter was hurt. He told her he was dead. She went in and knelt down by Whisman and cried. Grimes went into the bath-room. There was a light burning but nobody was there. The northwest room was not lighted. The Holtz room was lighted. He went into this room and saw the top drawer of the chiffonier was pulled out eight or ten inches. The clothes in this drawer had been disturbed and pushed up so that the drawer couldn't be pushed in without pressing the clothes down. There were two alarm clocks on the dresser, the alarms of which had been set for four o'clock and shut off, and Holtz's watch was hanging from an arm that holds clothes, on the south side. There was just room between the west wall and the foot of the bed for a person to pass. The foot of the bed was used as the head and the pillow was right at the window. There were two powder-burned spots on the pillow and sheet, burnt hair and a little blood on the pillow. There was blood on the sheet on the north side of

the bed. From the Holtz room Grimes went into the hall and there met Gerrard, one of the policemen who had come in response to his call. In the kitchen Grimes saw a hole in the back screen door punched through near the latch.

The police officers got Grimes' telephone call about 4:15 o'clock at the police station, which is about three and a half blocks from the Holtz house. They came to the house, using a Ford car, arriving in from four to six minutes after receiving the call. Harry Hughes, who was night patrol driver, testified that he and Younghen, one of the police officers, examined the dining room and kitchen. The windows were fastened. The back door in the kitchen was open about four inches, the screen was unhooked and there was a hole punched in the screen from the outside. They went out on the back platform, which is uncovered, and found three or four foot-prints on the dew on the steps leading up to it,—one on each step. They were two or three inches wide and three or four inches long,—just the sole of the shoe. Later in examining the neighborhood, about seven o'clock, they found a 38-caliber revolver, which Mrs. Holtz identified as belonging to Holtz, on the south side of McVey street, sixty-three feet southeast of the Holtz porch, fifty-four feet south of the sidewalk and about five or six feet north of the retaining wall. There were two or three indentations in the ground where the revolver had bounced and the end of the barrel had dirt in it. The revolver contained two shells which had been fired and three which were loaded. Hughes saw a trail of blood running from the Holtz room down the hall to the Whisman room,— that is, drops here and there.

George Gerrard, one of the police officers, testified that when they reached the Holtz house they were met at the door by Mrs. Holtz, who was holding the screen back. Gerrard asked, "What's the trouble?" and she answered, "There is one man shot and my husband is wounded." Gerrard said, "What's the occasion?" and she said, "Burglars,

I reckon." He asked, "Are they in the house yet?" and she said, "I don't know." Hughes then told her to get some clothes on. She was barefooted and in a night gown. Gerrard went up-stairs and found Mrs. Whisman sitting on the edge of the bed with bare feet and in a pink-colored gown, with her feet doubled back between Whisman and the bed, leaning over him. Gerrard went from the Whisman room into the Holtz room. There was a line of blood drops leading from the Holtz room through the hall into the Whisman room. He found Holtz sitting on the side of the bed, leaning on his elbow. He and Mrs. Holtz said he was shot. Holtz said it seemed like an electric shock. Gerrard said it was hardly burglars or they would have taken the watch, and asked what was missing. Mrs. Holtz said they hadn't looked, and started to look in the open drawer of the chiffonier. Holtz said, "Look in the drawer and see if my gun is there." It was not there and Holtz said, "He shot me with my own gun." Mrs. Holtz told Gerrard that she was in bed, on the south side, when the shot was fired; that she couldn't tell just what it was; that she jumped out of bed and ran to Walter's room, called for Walter and Grace and told them something terrible had happened; that Walter got up and started to her room, and she ran down-stairs, jumping over the banister when she got to the landing and cut across lots to the Grimes house. She said she had been to the bath-room about twenty or thirty minutes before the shot was fired and had gone back to bed and fallen asleep.

In the east wall of Holtz's room there was a bullet hole five feet seven inches from the floor. The bullet had entered the wall at an angle toward the northeast. After Mrs. Holtz and Gerrard went down-stairs she insisted it was done by burglars, and at Gerrard's suggestion she made search but missed nothing. The kitchen door was standing a little open, and the screen door, right opposite the hook, had a hole punched in it as if punched with an el-

bow,—funnel shape. The hook was about five inches from the screen, opposite the hole. Gerrard said he could probably put three fingers in the hole but not his hand, and he could raise the hook with a stick or lead pencil. He tried it. He also saw the foot-prints on the kitchen steps.

Mrs. Whisman was examined in the presence of Gerrard and officer Wrisk. She and Mrs. Holtz were not together before they were questioned by the police. Mrs. Whisman said she did not hear the first shot but she and Walter were awakened by Mrs. Holtz and got up. Walter ran out to the Holtz room and she fumbled around for the light but couldn't find it for a moment. She heard a shot, and immediately afterward Walter staggered back in the room with his hands out from the side of his body and up a little. She took hold of his arm and assisted him around to the east side of the bed. He started to sit down but fell on his back on the floor. She knelt down beside him, put her arm around him and he died before she left him. She then went part of the way to Grimes' and met him coming. She was lying down in the bed in her bed-room during this talk and seemed in distress and was weeping silently.

The doctor was at the house at 4:30 and Mrs. Holtz was assisting him in the care of her husband. She had telephoned when she came back from the Grimes house to J. F. Smalley, the interurban train dispatcher, who had known her for ten or eleven years, and asked who the company's physician was. Dr. Cloyd dressed Holtz's wound and took him to the hospital after examining Whisman's body. Holtz was bleeding from a small round hole in the scalp, about a half inch below the occipital protuberance. At the hospital he was given an anæsthetic and pieces of the bullet were removed from between the scalp and skull.

Charles Knox, the sheriff, arrived at the Holtz house between eight and nine o'clock. He talked with Mrs. Whisman there and with Mrs. Holtz at the hospital. He saw

the bullet hole in the east wall of the Holtz room and extracted the bullet from the plastering. The bullet entered the wall at an angle from the south and west. It was five feet seven inches from the floor and two and a half feet from the northeast corner. He saw Whisman's body at the morgue, and the bullet, which was 38-caliber, was passed through the wound in his breast and fitted very closely.

Dr. Funkhouser examined Whisman's body at the morgue in the presence of Dr. Fisher. The bullet, apparently from a 38-caliber pistol, entered the back about two and a half inches below the shoulder blade and about four inches to the left of the backbone. The wound was surrounded by a powder burn. The bullet ranged upward and through the muscles of the back and the chest cavity and passed through the heart and through the breast bone on a line with the nipples. The place of exit was perhaps four inches higher than the point of entrance. A 38-caliber bullet fitted the hole in the breast bone.

John Kelly, the chief of police, reached the house about 6:30 and interviewed Mrs. Holtz, whose statement was the same as that which has already been given. She added that on the last Saturday night there had been a prowler in the back yard while her husband was attending a union meeting of motormen at midnight, and upon his return she told him of it and he had showed her how to use his revolver. Kelly saw drops of blood from the Holtz room down the hall and going into the Whisman room.

Olive Russell lived next door east of Grimes and testified that Mrs. Holtz said to Grimes, "Oh! Mr. Grimes! Come to our house at once; someone is hurt; Walter is killed and Charlie is shot." Mrs. Grimes testified that Mrs. Holtz said, "There is burglars up to our house; Charlie is shot; there was three shots fired and I am afraid Walter is hurt." She asked who Walter was, and Mrs. Holtz said "that is Grace's man."

This was all the material evidence for the prosecution on the trial having any direct connection with the circumstances under which the shooting occurred, and it is clearly insufficient, of itself, to establish beyond a reasonable doubt that the plaintiffs in error, or either of them, did the shooting. It proves that a murder was committed, that Mrs. Holtz was present when her husband was shot and that Mrs. Whisman was in the house. It does not connect them otherwise with the fact of the shooting or show that the crime was not committed by some other person. Being present they had the opportunity to commit the crime, but opportunity, alone, is not sufficient to justify a conviction even though they are unable to show who did commit it. The burden still rests upon the prosecution to show, beyond a reasonable doubt, that the crime was actually committed by them and not by some other person, and this burden is not sustained by proof of opportunity to commit the crime not accompanied by proof that no other person could have had a like opportunity. There was no physical fact inconsistent with the commission of the acts by an intruder in the house, and if there is a reasonable doubt, from the evidence, as to whether they were committed by such person or by the defendants the conviction cannot be sustained.

At the time Holtz was shot he was lying in the bed, his head toward the west and his face toward the window just north of the bed. The revolver rested on the pillow, with the muzzle so close to Holtz's head that the fire from it scorched the hair on the back of his head. There were powder marks on the pillow from the cylinder and the fire from the muzzle burned a hole in the pillow. The revolver was evidently fired by a person standing at the foot of the bed, near which was Holtz's head, and between the bed and the chiffonier, which stood against the west wall. It is not an unreasonable hypothesis that a person rifling the top drawer of the chiffonier discovered the revolver and then had been startled by some conscious or unconscious motion

or sound from the sleeping man into believing he was about to be discovered and fired the shot. There is no evidence that the shot was so fired, but it is not inconsistent with the evidence and certainly no more unreasonable than that the wife shot her sleeping husband. Whisman was killed in the same room immediately after Holtz was shot, by a bullet from the same revolver, fired from behind and from his left side, which entered his back four inches to the left of the backbone and two and a half inches below the shoulder blade, went up through his heart, pierced his breast bone, emerging on a line with the nipples, perhaps four inches above the point of entrance, and lodged in the east wall of the room, two feet and a half from the corner. Whisman, roused from his sleep, whether by Mrs. Holtz or otherwise, came into Holtz's room and no doubt was shot while leaning over the bed to see what had happened to Holtz. The same person who shot Holtz no doubt shot Whisman.

If it is proved beyond a reasonable doubt that Mrs. Holtz shot her husband and killed Whisman, it is immaterial whether the evidence discloses any motive for these acts or not, but the presence or absence of a motive which would lead a person accused of a crime to commit that crime is material and important in determining whether he did, in fact, commit it,—particularly where, as in this case, the evidence is entirely circumstantial. Proof which establishes guilt beyond a reasonable doubt is sufficient without proof of motive, but proof of motive, though competent, is not sufficient to sustain a conviction unless a consideration of all the evidence convinces of the truth of the charge beyond a reasonable doubt. Evidence was introduced by the prosecution for the purpose of showing a motive for Mrs. Holtz to kill her husband and for Mrs. Whisman to kill her husband. There was no attempt to show a motive on the part of either to kill the husband of the other or of an agreement to join in killing either one or both of

the husbands, though the court instructed the jury as to the guilt of all conspirators as well as of accessories.

Edward Foster, who testified that he was a baker but who previous to the "work or fight" order had been a fortune-teller for eighteen or nineteen years and had practiced his calling in about forty different States, testified that in the summer of 1917 Mrs. Holtz came to his place and he gave her a reading. He testified that she said that Holtz was impulsive, headstrong and acted awful mean. She was afraid of him. She said she wanted to know if he could locate a photograph that Holtz had found in a book on the table, and he told her she would find it located in the woodshed, in a suitcase. She said that she was afraid that Holtz was going to get awful mad about it and tell the man's wife whose photograph it was, and she was afraid there would be some embarrassing situation. She said she was getting awful afraid of Holtz, and she hoped somebody would "Jonah" him so that he would get killed on the railroad. She spoke about being willing to give $300 if he was dead and out of her life. He didn't remember what he said to her.

Lena Foster, Edward's wife, who had been married to him since 1909 though she was not living with him at the time of the trial and did not know where he was, and did not know whether Foster was his name or not though that was the name he went by, testified that Mrs. Holtz, between April and August, 1917, was at her house to visit her husband as a clairvoyant and said she had a picture of a man by the name of Drover and Holtz had got hold of the picture in a book that she didn't think he would take up to read and he had threatened to give it to the wife of Drover. That was all she said at that time. The next time she said she found the picture under her rug when she cleaned her bed-room. Mrs. Foster testified that Mrs. Holtz told her husband that she would give anything to get rid of her husband. Mrs. Foster was at Mrs. Holtz's house in the

spring of 1917 and told her that if she had her home she would certainly be happy. Mrs. Holtz said she was unhappy; that she couldn't be with the one she wanted and she was unhappy. She showed her this picture and said his name was Will Drover. This witness was impeached by two witnesses, who testified that her reputation for truth and veracity was bad and that they would not believe her under oath.

Dollie Barton testified that about a year before the trial, at her home, Mrs. Holtz said, "I just want to show you where Charlie kicked me," and showed two blue marks on her hip. She had done domestic work for Mrs. Holtz and had never heard a quarrel or harsh word between her and her husband. Mrs. Holtz testified that her husband never kicked her and she never told Dollie Barton that he did, but that the spots she showed her she received by running against the corner of the sink in the kitchen.

W. F. Reiker testified that he conducted a grocery store on Gilbert street and that the Fairhall house was between his store and the Holtz house; that between one and three years before he had seen Will Drover go to the Holtz home ten or twelve times after Holtz had gone to his work.

Drover testified that Mrs. Holtz never had his photograph; that he had been at the Holtz home by himself and with his wife; that both Mrs. Holtz and Mrs. Drover belonged to the same lodge,—the Ben Hur; that the two families had been at the carnival and automobile riding together; that Holtz visited his house quite often; that when he went alone to the Holtz house he was sent there; that the last time he went there he went to take a book in which the names of the ladies of the club were, and there were no improper relations whatever between him and Mrs. Holtz.

Mrs. Drover testified that she had known Mrs. Holtz for eight or ten years; that they had been at her home together and separately; that she had frequently sent Drover to the Holtz home on errands,—in the summer of 1917

for eggs which Mrs. Holtz bought for her; that she and Mrs. Holtz exchanged bread,—she didn't know how many times,—and Drover took the bread to Mrs. Holtz.

Holtz had three insurance policies on his life, amounting to $5000, in which his wife was beneficiary, and, as has been stated before, he and his wife were joint tenants of the home. Whisman also had insurance policies on his life in favor of his wife, issued in 1919, amounting to $3000. There was no evidence that any of these policies on Holtz's life or Whisman's was issued at the instance of the wife.

The prosecution introduced evidence to show that on Friday evening, August 1, Mrs. Whisman was at the interurban station between five and seven o'clock, standing with a young man, and Whisman approached, talked with her a moment and shook her until her hat dropped from her hand where she was carrying it, and said, "I am done with you forever!" that she got on the car and sat with a man named Parker, to whom she said: "What do you think of that? I don't believe I can eat a bite of supper; he acted just like I had never been introduced to the young man; I met him down at the office this afternoon and had an introduction to him and he asked to walk down to the interurban station with me; I don't think I can stand it much longer." Parker was a widower, who with his wife, prior to her death, occupied the same apartment with the Whismans. The families were good friends. He and Mrs. Whisman had on the evening in question been invited by Mary Henry, also a friend of both families, who lived about two miles south of Danville, at Central Park, near the interurban station, to take dinner with them. At the dinner were Mrs. Whisman, Parker, Mrs. Sherman and a little girl. Parker and Mrs. Whisman went back to Danville on the 10:17 car.

Dollie Barton testified that on August 7, at the Wabash station, Mrs. Whisman told her that Walter raised the devil

at the interurban station and that they had agreed to dis-
agree and she was going to Chicago.   Mrs. Kinnamon,
Dollie's sister, was with her, waiting to take the train for
her home in Decatur, and she testified to the same conver-
sation.   Mrs. Whisman was there with her mother and sis-
ter.   The mother was going to West Lebanon.

Edward Foster, the fortune-teller, testified that Mrs.
Whisman consulted him once but he didn't remember any-
thing sensational about it; that she wasn't having domestic
trouble but was interested in somebody whose name started
with "J."   This was in 1917.

Mary Douma testified that Mrs. Whisman told her sev-
eral months ago, on the street, that she was going to leave
her husband because she was tired of keeping him.

B. H. Snyder, assistant State's attorney, testified that
in her statement to the State's attorney Mrs. Whisman said
that she and Merle Govan, a young woman, met in Chicago
July 26 and went to the Congress Hotel, where Merle Govan
registered them as Mrs. Wilson and Mrs. Miller.

Agnes Crannock, an unmarried woman, visited at the
Holtz-Whisman home and talked with Mrs. Holtz and Mrs.
Whisman on August 8.   There was some "foolish" conver-
sation about Agnes marrying.   In the conversation Mrs.
Whisman said, "Well, if you get married you will have to
work just the same," and "if I didn't have a husband I
wouldn't get married."   They were all laughing.

The sheriff testified that at an interview in the State's
attorney's office August 9 Mrs. Whisman said she or her
sister sent a telegram to Parker, who was in Indiana, and
with reference to the affair at the interurban station said
that her husband stepped on her foot and she said some-
thing to him.

Mrs. Elizabeth Brandt, from whom Parker rented a
room in July, 1919, testified that July 9, about six o'clock,
Parker and Mrs. Whisman came·to her house to the kitchen,·
where she was ironing, and wanted to see the *Commercial-*

*News,* which contained an account of the accidental killing by Albert Meyers of his wife; that Mrs. Whisman said she knew Meyers well; that the witness took her into the living room and got the paper, and she sat there and read it and then went away with Parker about seven o'clock.

Albert Meyers testified that neither he nor his wife was acquainted with Mrs. Whisman prior to July 10, but Mrs. Meyers was acquainted with Mrs. Holtz, and Mrs. Holtz and Mrs. Whisman called at the Meyers residence that day.

On the part of the defendants more than a dozen witnesses, people who had lived in their home at different times for various periods, acquaintances, neighbors and friends, testified to their knowledge of the relations between Holtz and his wife, derived from their association with them and frequent calls and visits, and stated that they had never observed any quarrel or trouble of any kind between them. So far as Mrs. Holtz is concerned, this testimony is scarcely sufficient to raise a suspicion of any unpleasant relations at any time between her and her husband, much less to be regarded as furnishing a motive for her murdering him. The circumstances mentioned are her relations with Drover, her talk with the fortune-teller and his wife and the incident referred to by Dollie Barton. As to the first of these, any undue friendship or supposed intimacy of an improper character is completely rebutted by the testimony of Mr. and Mrs. Drover, the friendly social relations between the two families and the neighborly exchanges between the two women, in which Drover acted as the agent of his wife. The relations shown also raise a grave doubt as to the correctness of the reports by the fortune-teller and his wife of the statements of Mrs. Holtz to them. Mrs. Holtz contradicts Dollie Barton's version of the incident to which the latter testified. All of this testimony refers to incidents happening from one to three years before the murder, and in the interval Mr. and Mrs. Holtz had been living together, so far as the evidence shows, in entire concord and

amity.   As to Mrs. Whisman the evidence is no stronger.
It consists of the incident at the interurban station, the con-
versation at the Wabash railroad station, the call on Mrs.
Brandt, the visit to the Congress Hotel, and her statements
to Mary Douma and Agnes Crannock.   The affair at the
interurban station, if it occurred as stated by the witness,
was humiliating because of its publicity and would justify
strong resentment on the part of Mrs. Whisman.   She her-
self gives a different account. of it, saying that there was
no young man with her; that her husband came up with
Parker, and that her husband did not say that he was done
with her forever.   Whatever resentment Mrs. Whisman may
have had, she returned home in a few hours and continued
to live with her husband at the Holtz's in apparently as
friendly relations as before.   The conversation at the Wa-
bash railroad station is denied by Mrs. Whisman and by
her sister, Dorris Sexton, and by Nellie Fenwick, who were
present, heard what was said, and testified that Mrs. Whis-
man did not make the statements testified to by Dollie
Barton and her sister, Mrs. Kinnamon.   The call on Mrs.
Brandt and the registering of her at the Congress Hotel by
another person under an assumed name were incompetent
for any purpose.   She denied the statement to Mary Douma,
and said, what is manifestly correct, that she was not sup-
porting her husband, and the talk of the two women with
Agnes Crannock, as Miss Crannock testified, was merely
laughing badinage.

The existence of the insurance policies and the condi-
tion of the title to the Holtz house, in the absence of other
evidence, has no tendency to show a motive to destroy life.
Such conditions are of usual occurrence, but in the ab-
sence of special circumstances in the particular case can
not be regarded as furnishing a motive to those who would
become beneficiaries because of the death of the insured
person or the owner of the property.

294 — 11

There was no evidence of motive to commit the crime which had a tendency to prove the guilt of the plaintiffs in error. The plaintiffs in error were taken into custody in the afternoon of August 9, and confined in jail until their preliminary examination,—about ten days. Nina Johnson, a colored girl twenty years old, who had been confined in the jail five months at the time of the trial, testified that Mrs. Whisman was put in her cell for two days and afterward was taken out and Mrs. Holtz was placed in the cell with the colored girl until she had her preliminary examination and was discharged. Nina testified that Mrs. Holtz got friendly with her and said, "I will venture my story why I am here if you will venture yours;" that Mrs. Holtz told her that a girl came to her house to rent a room but Mrs. Holtz told her the rooms were occupied; that Mrs. Whisman came in and they were talking about Mrs. Whisman having to work and having a husband, and Mrs. Whisman said, "Well, if I ever get rid of this one I got I will never get another one;" that Mrs. Holtz said she was scared about a man's picture that had been found and she didn't know what she would tell the State's attorney about it; that one time after Lewman had talked with her she said, "He has got something else on us;" that he asked if they had been automobile riding late at night and if a car drove up to the house late at night, and she told him it was a notorious lie and that nobody but a nosey old neighbor told that; that she said it was about two o'clock at night; that she didn't say who was with her or where she had been; that Lewman wasn't as smart as he thought he was and she had pulled one over on him; that if she could get away from the running proposition she would come clear at the preliminary, as she knew she did wrong in running; that Holtz knew she didn't shoot him, for he put his hand on her and felt her there in bed; that she was afraid Charlie would change his statement; that he would tell about seeing her at the drawer where he kept

his revolver; that there was nothing in the drawer but receipts, deeds, papers and the revolver; that she was scared about the nightgowns, and the State's attorney had two gowns and an apron that belonged to her and two gowns that belonged to Grace, and her gown and the apron had blood on them, but the blood came from Grace putting her arm around her husband as he was dying; that another time she told her that she didn't know how the blood got there; that Mrs. Whisman was not in the room when her husband died; that she said she was standing at the chiffonier drawer when her husband roused out of sleep; that she didn't see the man who did the shooting, but some of the neighbors said four shots were fired but she only heard two; that she said that she knew that if Charlie knew that she shot him he wouldn't give her away because they had been together since she was in knee dresses; that she knew he would stick by her, because he told her attorneys that they could take his property, if necessary, just so they saved his wife's name and squashed the preliminary; that Mrs. Whisman had turned over her insurance money to her attorneys; that she was glad the State's attorney had it in his head that Billy Parker did the shooting; that Jess Rogers was the death watchman there at the jail, and if he asked Nina anything about the case to tell him that she didn't know anything; that the State's attorney had touched on several warm spots; that he asked Mrs. Whisman if he proved to her that Mrs. Holtz killed her husband would she be willing to have her prosecuted, and Mrs. Whisman said she certainly would; that they asked her about what they did before they went to bed that night and who went to bed first and whether they had left the light burning down-stairs, and she said if she did they did it thoughtlessly; that the State's attorney had sent Buell Snyder and officer Gerrard to West Lebanon, Indiana, to find out their reputation, and they got wind of it at once; that she was afraid she would be bound over to the grand

jury; that the day before the preliminary she wrote Nina a note right after dinner, another colored girl being in the cell asleep, which she told Nina to read and destroy; that the witness tore it up and put it in her pocket and two days later gave the note to the State's attorney. The note was as follows: "Mr. Lewman is sending for a party from Indiana and paying his expenses going and coming in order to get him to talk. Of course, if he comes he will tell things that will give everything away. Don't tell this, and besides, tear this note up and put it in the toilet. That's why I want to see my lawyers." She said that the party that had been sent for was Parker and that she would spend all her money to keep him away. She said that May had put her next to the dictagraph, and that the State's attorney thought he could get some evidence out of her and Grace, but she told Grace to keep still.

Five witnesses who were acquainted with Nina Johnson and for whom she had worked, testified that her reputation for truth and veracity was bad and that they would not believe her under oath. Mrs. O. D. Mann, who had employed her for two years and became acquainted with her handwriting by seeing her indorsement on checks and letters she had written, testified that the note in question was in Nina's handwriting. Rose Coffey, who had known Mrs. Holtz for twenty-four years and knew her handwriting, testified that in her judgment the note was not in Mrs. Holtz's handwriting. Dorris Sexton, Mrs. Holtz's niece, who knew her handwriting well, testified that the note was not written by her, and Alta Weaver, who became acquainted with Mrs. Holtz's handwriting in lodge work and in receiving letters from her, also testified that the note was not written by her. Mrs. Holtz denied that she wrote it. Seven of the checks indorsed by Nina were introduced in evidence. In rebuttal two witnesses testified as experts that they could not tell whether the handwriting of the note and of the indorsements was the same.

Nina testified that there was an Italian woman at the jail named May, who was in the same cell at night with her and Mrs. Holtz. The sheriff testified that he put Mrs. Holtz and Mrs. Whisman in a cell where a dictagraph was installed, but he did not know of either of them saying anything to each other about the matter after they were in the cell.

On its face the testimony of Nina Johnson seems improbable. It is difficult to believe that Mrs. Holtz on her own initiative would propose an exchange of confidences with this strange negro girl prisoner. The situation was not such and their relation was not such as to inspire confidence. No other inconsistency in Mrs. Holtz's various and numerous statements appears in the record. After the examinations to which she had been subjected it is not reasonable to believe that she would voluntarily pour forth to a stranger, for no apparent cause or purpose, the stream of statements to which the witness testified. If the source of the testimony were unimpeachable it might carry conviction though apparently unreasonable. But here the witness is of another race from the confiding woman. She is much younger. She is charged with crime, and this seems to be the only point of contact between the two. Her reputation for truth and veracity is impeached by credible witnesses. The evidence tends to show that she wrote the note which she testified was signed by Mrs. Holtz. Mrs. Holtz testified that the only conversation she had with Nina Johnson about the case was a few days after she had been put in jail, when Nina, after telling her what had been in the paper, asked her if she had any idea who had done this and who she thought it was. Mrs. Holtz told her that she and her husband had been instrumental, through the testimony they had given, in sending a mulatto to the penitentiary and he had sworn that he would get Holtz some day, and that Mrs. Holtz would always believe it was the mulatto unless someone confessed.

The plaintiffs in error both testified on the trial, their testimony agreeing substantially in all respects with the statements which they had made after the homicide. Mrs. Holtz's testimony was that Holtz came home on August 8 between two and three o'clock in the afternoon, changed his clothes and was engaged during the afternoon in fixing the sewing machine and working on the garage. He and Mrs. Holtz had supper about six o'clock. Mrs. Whisman reached home between six and seven, and about an hour later Mrs. Holtz and Mrs. Whisman went to the basement to iron clothes and ironed until about ten o'clock. Whisman came home between seven and eight, and after going to his room went to the basement and talked with them for a time. He then went into the back yard, where Holtz was sprinkling the garden and flowers. After finishing ironing Mrs. Holtz carried the basket of clothes to the dining room and went to the kitchen, made some ice water, waited until it got cold, drank two glasses, went on upstairs, took the clothes to the northwest room and went to bed. Holtz was then in bed. Mrs. Whisman preceded Mrs. Holtz up-stairs and found Walter with his coat and shoes off, reading a paper. They talked a few minutes and went to bed. Mrs. Holtz latched the kitchen screen door before going up-stairs. There was no hole in the screen then. The kitchen door was left open. The front door was locked. It had a night lock and when the door was closed it was locked. It could be opened from the inside by turning the knob but not from the outside. The light down-stairs at 3:30 in the morning and the light in the bath-room when Grimes reached the house were not accounted for. Mrs. Holtz heard only the first shot, Mrs. Whisman only the second. When Mrs. Holtz went downstairs she found the front door standing open. Alta Weaver testified that she was at the Holtz house on August 8 and left at five o'clock. She had occasion to notice the screen door in the kitchen and there was no hole in it. Mrs. Whis-

man's testimony agreed substantially in all material respects with Mrs. Holtz's and with her own previous statements. She denied that she had ever had any trouble with her husband. She had never seen the revolver, did not know that Holtz had one and did not know who shot her husband.

There is no material conflict in any of the statements of the plaintiffs in error unless the testimony of Nina Johnson is accepted as true. There is some discrepancy in the testimony as to what Mrs. Holtz said when she went to Grimes' house. Grimes testified that she said there were burglars up there and there was shooting; that Charlie was shot and she was afraid Walter was hurt. Mrs. Grimes testified that she said: "Oh! my God! Come quick; there are burglars in the house; Charlie is shot," and afterward, when she got down-stairs, her next door neighbor wanted to know what was the matter, and Mrs. Holtz said: "There are burglars up to our house; Charlie was shot; there was three shots fired and I am afraid Walter is hurt." Olive Russell, who lived in the next house east of the Grimes house, went to her kitchen window when she heard somebody screaming and crying, about four o'clock, and heard someone say, "Oh! Mr. Grimes! Come to our house at once,—someone is hurt; Walter is killed and Charlie is shot." The discrepancy in the testimony of these three witnesses, in consideration of the nature of the occurrences and the excitement of the moment, is not greater than frequently occurs and is to be anticipated. The recollection of the words used is very easily influenced by the nature of the events as they are afterward ascertained, and implicit reliance cannot be placed upon the verbal accuracy of witnesses who give an account of the words used or the statements made under the circumstances then existing. The same thing may be said of the inquiry of Mrs. Whisman when Grimes came out of the room, whether Walter was hurt. She testified that she thought he died while she had her arms about him; that sometimes she thought he was dead

and sometimes she thought he was living. It was natural that she should inquire as to his condition, and in the excitement of the moment the form her question took, if it was in the form which Grimes testified, is not evidence that her testimony given on the trial or the statements as to the occurrences at the time of the shooting, and afterward, are untrue.

A consideration of the whole evidence is not so convincing as to remove all reasonable doubt of the guilt of the plaintiffs in error. No circumstances have been shown inconsistent with their innocence, and it is essential to a conviction upon circumstantial evidence that the facts proved be not only consistent with the defendant's guilt but that they be inconsistent with his innocence upon any reasonable hypothesis. Here the evidence leaves that serious and well founded doubt of the defendants' guilt which requires the court to reverse the judgment.

On the trial Holtz was offered as a witness in behalf of Mrs. Whisman, and it was proposed to prove by him that after he had been shot Whisman came into his room and asked him what the trouble was, and after he got into the room and to the side of the bed he was shot by somebody in the room; that he was shot by a man, and that when the shot was fired Mrs. Whisman was not in the room but was in her room and did not come into the room at any time; that this occurred after Mrs. Holtz had left the room, and that after he had been shot Whisman groaned and turned and staggered from the room and down the hall, with his hands somewhat uplifted; that Holtz could see him faintly from the light that came from Whisman's room, and just as he saw Whisman go out of the door and down the hall he heard a noise as though the door was slammed against the wall; that he turned and looked, and as the form turned around inside the door towards the light that came in through the door that led out to the hall he saw the form of a man stooping over as though

picking up his hat, and the man half straightened up and went out in a half-stooping position slowly down the hall and then hurried on down-stairs and out doors. The court sustained an objection to the competency of the witness and it is argued that this was erroneous. The ruling was clearly right. When two or more are jointly indicted for a crime their defenses are so far separate that evidence which is competent for or against one may be received although incompetent as to the co-defendants. But this does not affect the rule that neither the husband nor wife is admissible as a witness in a cause in which the other is a party. This rule is founded not only on their identity of interest but partly on principles of public policy, and excludes the testimony of the husband or wife if it concerns or directly affects the other, though where the grounds of defense are several and distinct and in no manner dependent on each other, the husband or wife of one defendant may testify for another as to any matter bearing exclusively upon such other. (*Gillespie* v. *People,* 176 Ill. 238; *Creed* v. *People,* 81 id. 565; 1 Greenleaf on Evidence, secs. 334, 335.) The matter about which it was proposed to examine the witness was the persons who were present at the time when Whisman was shot, and though counsel stated that they did not propose to ask about whether Mrs. Holtz was in the room or not, they did expect to show that the shooting of Whisman occurred after she left the room, and that as Whisman was going down the hall Holtz saw the form of a man in a half-stooping position, who went down the hall and hurried down the stairs. The effect of this evidence would have a direct tendency to secure the acquittal of Mrs. Holtz by showing that she was not present and that another person was present who could have done the shooting.

The court gave an instruction as to accessories and their responsibility and punishment in the language of the statute. The following instructions were also given:

"The court instructs the jury, as a matter of law, that if two persons conspire to do an unlawful act and death occurs in the prosecution of the common object both are guilty of the homicide. The act of one of them done in furtherance of the common design is in the consideration of the law the act of both, and he who, being present, aids, abets, assists, advises or encourages, or, not being present, hath advised or encouraged to do an illegal act, is responsible for all the natural and probable consequences that may arise from its perpetration."

"The court instructs the jury, as a matter of law, that in this cause to constitute the crime of murder it is not necessary for the State to show that it was or may have been the original intent of the defendants, or either of them, to kill the deceased, Walter Whisman. It is sufficient if the jury believe from the evidence, beyond a reasonable doubt, that the defendants combined to do an unlawful act, and that the deceased was killed by the defendants, or either of them, in the attempt to execute such unlawful act."

The plaintiffs in error make the objection to these instructions that there was no evidence to base them on. The fact that two persons may be jointly concerned in a homicide would not, alone, be evidence of a conspiracy to commit it. A conspiracy must be proved like any other fact, and this may be done by circumstantial evidence which establishes the fact. To justify the conclusion that a conspiracy existed there must be evidence of some agreement or some joint action toward accomplishing the object of the conspiracy. There is no such evidence in this case. No word spoken or act done in concert looking toward the accomplishment of the crime is shown, and the circumstances shown or statements made after the commission of the crime do not tend to show a conspiracy to commit it. If it be assumed that Mrs. Holtz is guilty, then it is consistent with the evidence that Mrs. Whisman knew nothing of the crime until it was done. Her subsequent acts or words

could not make her a conspirator and responsible for acts already done, nor would her knowledge of the crime and her subsequent acts or statements make her responsible as an accessory to its commission. She would only be an accessory after the fact and responsible as such. It was error to give these instructions.

The judgment will be reversed and the cause remanded.

*Reversed and remanded.*

CARTWRIGHT, C. J., and THOMPSON, J., dissenting.