THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
EUNETA HOWARD, Defendant-Appellant.

Second District No. 77-403

Opinion filed July 24, 1979.—Rehearing denied September 18, 1979.

Mary Robinson, of State Appellate Defender's Office, of Elgin, for appellant.

Dallas Ingemunson, State's Attorney, of Yorkville (Phyllis J. Perko and William L. Browers, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE LINDBERG delivered the opinion of this court:

Defendant Euneta Howard was convicted by a Kendall County jury of the January 27, 1977, murder of Christopher Wayne Alfter, her four-year-old son. She was sentenced by the court to serve a term of 15 to 45 years imprisonment in the State penitentiary. On appeal, the defendant

contends that the evidence presented at trial failed to establish her guilt of the crime beyond a reasonable doubt. We agree and reverse.

Christopher Wayne Alfter was murdered on the morning of January 27, 1977, while he was sleeping on a sofa in the living room of defendant's home located at 79 Sheffield in Boulder Hill. Defendant, who worked a late shift at a nearby Western Electric plant, was home alone at the time and called the police herself. She told the police officers who responded to her call that she drove her mother to work in the morning, returned home, and left her son sleeping on the living room couch while she showered; when she finished her shower, she walked into the living room, discovered the boy's body together with a threatening note, and then called the county sheriff's police for help.

Prosecutorial suspicions soon focused on defendant and she was subsequently indicted by a Kendall County grand jury for her son's murder. Defendant pleaded not guilty to the charge contained in the indictment. A six-day jury trial was held, at which the testimony of numerous witnesses was presented; the trial transcript alone, excluding the common law record and hearings on motions, is over 1,000 pages. At trial, the prosecution endeavored to prove that defendant did not shower on the morning of the 27th, and that the other evidence pointing to an unknown intruder as the killer had been fabricated by defendant. It also attempted to show that no one but defendant could have killed her son. The defense adhered to the story given by defendant to police on the morning of the murder: that her son was killed by an intruder while she was in the shower. In addition, the defense attempted to show the existence of prior threats against defendant. Although the length of the record prohibits a comprehensive recitation of the evidence adduced at trial, we have set forth the salient facts below with as much detail as is possible under the circumstances.

The prosecution's evidence showed that about 10:55 a.m. on January 27, 1977, Sergeant Thomas W. Burgholzer of the Kendall County sheriff's police received a call from the defendant while he was working in the police communications center. Defendant told him that she needed help, that her son was injured and she thought he was dead. Police were immediately dispatched to the Howard residence located at 79 Sheffield in Boulder Hill; an ambulance was also called. About 15 minutes later, defendant placed a second, similar call to the Illinois State Police in Elgin, asking why the police had not yet arrived. She was told that she must have called someone else and that police officers would respond to her call.

Burgholzer arrived at the house at about 11:12 a.m. that morning. An ambulance and another Kendall County police officer, Sergeant John Taylor, had arrived immediately before him. Upon entering, Burgholzer saw the body of the victim lying on the couch in the living room,

covered by a sleeping bag. On top of the sleeping bag was a white piece of paper upon which the following words were printed: "I GOT YOUR ~~SON~~ CAR I KILLED YOUR SON BUT NOW I'M DONE." A knife was found under the bag by an emergency medical technician. The medical technician was unable to detect any signs of life upon examining the body of the child. Although the boy's body was still warm at the time, it was not possible to estimate how long the boy was dead. An autopsy later determined the cause of death to be complications resulting from five stab wounds in the boy's back.

Sergeant John Taylor, who had arrived at the same time as the ambulance, had an opportunity to observe and question defendant at the time. Defendant was neatly dressed, wearing a sweater, blouse, and slacks. Although she was able to answer the officer's questions, she was visibly distraught and broke down weeping at least two or three times.

Sheriff Thomas N. Usry of the Kendall County Police arrived at the Howard residence at 11:36 a.m. One of the officers already on the scene gave him a brief summary of what the investigating officers had found. Usry then inspected the home himself, beginning with the bathroom as defendant had been reported to be in that part of the house. Upon entering, he noticed a full-size bath towel on the floor with one end draped over the side of the tub. The towel was dry at one end but wet at the end inside the bathtub. The shower curtain was drawn across the full length of the tub; Usry was unable to detect any water clinging to it. Usry then opened the curtain and felt along the faucet and the walls, but again did not detect the presence of water. However, he did observe a small layer of water, less than one-sixteenth of an inch in depth, in the bottom of the bathtub. He examined the soap holder and touched the soap; both were dry. A second towel of medium size was found on the floor. This towel was "quite damp." There were no windows in the room and the exhaust fan was not on when he entered.

In a front dresser drawer of a secretary desk in the living room, Usry found a piece of paper towel with the word "WE" printed in one corner of the paper. A kitchen towel was also found in the area of the kitchen sink.

Robert Cabanne, a "questioned document examiner," tested both notes found at the scene. He said that both notes were once part of the same paper hand towel, and that they were written by the same individual. However, he was unable to identify the writer. He also stated that he could not say that the notes were written with two pens found in the Howard residence, as the ink used in the pens was obtained from common sources. He compared the paper towels used in the notes with paper obtained from the Western Electric plant at which defendant worked, and found them to be the same type of paper. However, the examiner stated he was "definitely not" testifying that the towels used for the notes came in fact from defendant's place of employment.

Joseph Ambrovich, an evidence technician, examined the two notes, the butcher knife, and the victim's face, neck and hands, but was unable to detect the presence of latent fingerprints. No prints were found in the couch area of the living room. However, six separate sets of prints, found near the kitchen sink—three fingerprints and three palm prints—could not be matched to any of the occupants of the house (*i.e.*, defendant, her mother, brother, and son). No prints were taken from the front door or back window.

A criminologist testified that the blood found on the kitchen towel matched that of the victim. A blood impression on the towel was also found to match that of the knife found near the victim's body. There was no positive testimony, however, that this knife was used in the killing.

Defendant gave two statements to the authorities, the details of which were introduced into evidence at trial. The first statement was made on the day of the incident, and the second six days later during an interrogation by the state's attorney. Defendant's version of what occurred on the morning of the 27th was substantially the same on each occasion. Defendant told the police that she got up about 6 a.m. that day, drove her mother to work, and returned home at about 6:45 a.m. She worked on some bills while her son watched television. (These bills were found on the secretary desk.) At about 10:30 a.m., she saw that her son had fallen asleep and she decided to take a shower in the bathroom. After finishing her shower, she heard the sound of the television blaring quite loudly from the living room. She called to her son to turn down the volume but got no response. Upon entering the living room, she found the front door open, so she closed it. She then walked to the couch where she found the knife and the threatening note. She picked them up, read the note, and put them back. She touched her son and felt blood on her hands. She then went to the kitchen and wiped her hands on a green and white striped kitchen towel, left the towel in the sink, and called the police.

In anticipation of the defense argument that an intruder who was attempting to victimize or persecute the defendant actually killed Christopher Alfter, the prosecution presented the testimony of witnesses who attempted to explain away the obscene and threatening phone calls allegedly received by defendant prior to the murder, and to otherwise rebut the "persecution" theory advanced by the defense. Detective Michael Alsup testified that he was unable to find any neighbors who saw or heard anything unusual on the morning of the murder. Alsup also testified that a trap was placed on defendant's phone on January 21, 1977, as a result of her complaint that she was receiving obscene phone calls. Two of the calls were explained away, but the source of one call could not be determined. Alsup admitted, however, that certain calls may not be trapped by the telephone company. Another prosecution witness, a 14-

year-old boy, testified that he placed one of the phone calls to defendant, selecting the phone number at random. He denied using obscenities.

Richard Saunders, an acquaintance of Euneta Howard, testified that one night prior to January 27, defendant told him and Marlin Summers that someone had let the air out of her tires in a parking lot. Defendant also said she found a note in her car which read, in effect, "I'm going to get you." According to Saunders, defendant had no idea who let the air out of her tires or who left the note. Michael Matthews, a co-worker of defendant, also testified that he was with defendant in the parking lot on the night of the alleged incident, but left before she did in his own car. He did not look at her car's tires or see her leave the lot.

Velma Howard, defendant's mother, testified for the defense that she lived at 79 Sheffield along with Euneta, her son Geffrey, and her grandson Christopher. On the morning of the 27th, she awoke, dressed for work, and at about 6 a.m., asked defendant to take her to work. Velma Howard then woke Christopher, put a snow suit on him and also put a sleeping bag around him for extra warmth. The three left for work about 6:30. Velma Howard did not notice anything peculiar about defendant's behavior that morning. She further testified that she had received threatening and obscene phone calls on her daughter's phone on January 22, 1977, at about 8 p.m., and on January 18, at around 12:45 to 1 a.m. Also, on January 20, 1977, her daughter called to tell her the top of her car had been slashed in the parking lot. She testified that she saw the car that evening with its slashed top and rear window.

At the time of the incident, Euneta had been living with her mother for about a year. Velma Howard testified that defendant was a very good mother who cared for her son.

Geffrey Howard, defendant's younger brother, testified that he answered his sister's phone at 5:30 p.m. on January 23, four days before the murder. The caller reportedly said: "I'm going to get her. I'm going to get her good. I got her car."

Randy Hester and Jeff Hawkins, both residents of Boulder Hills, testified that between 10:30 a.m. and 11 a.m. on January 27, 1977, they saw a hooded figure walk quickly away from the area of the Howard residence. Daniel Craven, the child of a former next-door neighbor to the Howard's, testified that, during the morning of the 27th, he heard the front door of the Howard home slam open "real fast," hit the wall and then stop.

In addition to this testimony, other defense witnesses testified to prior threats made against defendant in a bar by Guadalupe Olvera the prior October. According to these witnesses, Olvera threatened defendant, telling her he would "cut her guts out."

Defendant testified on her own behalf. She denied stabbing her son

to death, stating that she would never harm him. On cross-examination, defendant was extensively questioned about the prior threats she had received, the incident with Guadalupe Olvera, the slashing of her car roof, and the time the air was let out of her tires in the Western Electric parking lot; she essentially corroborated the statements she had previously given to the police. She was not questioned regarding her activity at the time her son was stabbed.

Finally, a meteorologist, with expertise in the evaporation of water, testified, in response to a hypothetical question, that it was very likely that much of the water in the bathtub could have evaporated in a very short time, within 45 minutes. After this testimony, the defense rested.

On rebuttal, the prosecution presented further evidence to show that Guadalupe Olvera was not the killer of Christopher Alfter, as the defense evidence suggested. The evidence technician, Joseph Ambrovich, testified that he was given both the finger and palm prints of Olvera, and these did not match the unidentified prints found in the kitchen. Olvera himself testified; he denied knowing the defendant. He admitted his involvement in a fight in a bar in October 1976, but denied threatening defendant.

On this appeal, defendant contends that the People's case, based entirely on circumstantial evidence and her presence on the scene, was insufficient to prove her guilty of the murder of her son beyond a reasonable doubt. On this question, our responsibility as a reviewing court is clear:

> "* * * [I]t is always the duty of this court to examine the evidence in a criminal case, and if it is so improbable or unsatisfactory as to raise a serious doubt of defendant's guilt the conviction will be reversed." *People v. Coulson* (1958), 13 Ill. 2d 290, 296, 149 N.E.2d 96, 99; *People v. Jefferson* (1962), 24 Ill. 2d 398, 182 N.E.2d 1; *People v. Sheppard* (1949), 402 Ill. 347, 83 N.E.2d 587.

It is well established that, to warrant conviction of a crime on circumstantial evidence, the proof must be of a conclusive nature and tendency, leading on a whole to a satisfactory conclusion and producing a reasonable and moral certainty that the accused and no one else committed the crime. (*People v. Widmayer* (1948), 402 Ill. 143, 83 N.E.2d 285, *People v. Hooper* (1936), 364 Ill. 320, 4 N.E.2d 490.) Moreover,

> "Where the State's case is circumstantial, proof beyond a reasonable doubt requires the exclusion of every reasonable hypothesis, based on the evidence or on the absence of evidence, which is consistent with defendant's innocence." *People v. Robinson* (1975), 33 Ill. App. 3d 24, 35, 337 N.E.2d 356, 365; accord, *People v. Nunnley* (1975), 34 Ill. App. 3d 4, 339 N.E.2d 537.

On the record before us in the case at bar, we must conclude that the prosecution failed to prove defendant guilty of the offense of murder beyond a reasonable doubt. A review of all the evidence introduced on behalf of the People demonstrates that the prosecution: (1) failed to introduce any substantial evidence which directly or indirectly incriminates defendant with the murder of her son; (2) failed to prove that the evidence found on the scene indicating the presence of an intruder on the morning of the 27th was fabricated by defendant; and (3) failed to prove that defendant did not shower on the morning of the murder, as she claimed. As a result, we must reverse the judgment of the circuit court.

The People initially argue that the two notes and the kitchen towel found in the Howard home are among the evidence which "strongly tied defendant, herself, to the murder of Christopher Wayne Alfter." We cannot agree. The prosecution was clearly unable to connect either of the notes, the kitchen towel, and the alleged murder weapon to the defendant. The handwriting expert who testified on behalf of the prosecution was unable to give an opinion as to who wrote those notes. While the State's expert was able to opine that both notes were written by the same person, this hardly proves that the defendant was that person. In addition, the evidence technician was unable to detect the presence of fingerprints on either of the notes. While the kitchen towel did contain an impression as if a knife had been wiped on it, there was no evidence proving that defendant in fact did the wiping.

The probative value of the butcher knife found at the scene of the murder is equally ambiguous. No fingerprints were found on the knife itself. Although the prosecutor stated in opening argument that the evidence would show that Mrs. Velma Howard owned the knife, no such proof was forthcoming at the trial. Thus, there is nothing to tie the defendant to the alleged murder weapon. Moreover, we note that the jury was required to infer that that knife was the murder weapon from its presence near the boy's body. There was no positive testimony that the knife was used to stab the victim to death; the pathologist who conducted the autopsy of the victim's body alone testified offhandedly that it was "possible" the knife caused the fatal wounds. This equivocal evidence cannot be said to even remotely tie defendant to the murder.

Equally equivocal is the testimony on whether the bathtub was wet or dry following the murder of defendant's son. At the time the sheriff inspected it, he was unable to detect moisture on the walls or the shower curtain; however, the bottom of the tub was wet. But, as the prosecution admits, the sheriff's inspection could not have occurred, at a minimum, until at least 45 minutes after defendant had finished her shower. In this respect, an evaporation expert who testified for the defense stated that this time was sufficient to allow much of the moisture to evaporate. In any

event, a towel was found on the floor of the bathroom which, according to the sheriff, was "quite damp." Clearly, the prosecution failed to prove the defendant did not take a shower or faked taking a shower on the morning of the murder.

■■ Also important to our decision in the instant case is the failure of the prosecution to prove any motive on defendant's part for the killing of her son. While we are well aware that the prosecution is not required to prove motive to sustain a conviction, "* * * [t]he presence or absence of a motive which would lead a person accused of a crime to commit that crime is material and important in determining whether he did in fact, commit it, particularly where, as in this case, the evidence is entirely circumstantial." (*People v. Holtz* (1920), 294 Ill. 143, 128 N.E. 341, 345; see also *People v. Richards* (1970), 120 Ill. App. 2d 313, 256 N.E.2d 475, 487.) There is no evidence to suggest the reason why defendant would murder her own son. According to family members who knew her best, defendant was a good mother to Christopher, keeping him clean, well-fed and cared for. The prosecution did not attempt to refute this testimony. There is no evidence that Christopher was ever a victim of child abuse, or that he was killed for insurance money. In sum, no reason for the murder was ever proved.

Notwithstanding these lapses in proof, the police discovered six sets of fingerprints in the kitchen that could not be matched to *any* of the occupants of the Howard residence. Surprisingly, the prosecution attempts to explain those prints by arguing that it is "entirely possible" someone else had accompanied defendant home after work the prior evening and left the prints on the kitchen counter. The record, however, is silent as to any visitors being present in the Howard residence the prior day.

In sum, there is no substantial evidence connecting defendant with the killing or indicating that defendant fabricated the murder notes or the other exculpating evidence, as the prosecution claimed. In the absence of such evidence, the jury was required to infer guilt from little more than defendant's presence at the scene of the crime and her opportunity to murder the victim. However, it is well established that the presence at the scene of an offense is insufficient, without more, to establish guilt beyond a reasonable doubt. (*People v. French* (1966), 75 Ill. App. 2d 435, 458, 220 N.E.2d 635, 638; *People v. Boyd* (1959), 17 Ill. 2d 321, 327, 161 N.E.2d 311.) Likewise, opportunity alone is not sufficient to sustain a conviction where the prosecution is unable to show who committed the crime, unless it can also show that no one else had the opportunity to commit the offense. (*People v. Holtz* (1920), 294 Ill. 143, 128 N.E. 341, 345.) In this case, we believe such proof is entirely lacking. Indeed, certain of the prosecution's own evidence lends credence to the intruder theory relied upon by the defense (*i.e.*, the unidentified fingerprints).

The only real evidence introduced by the prosecution in support of its argument that defendant killed her son are inconsistencies in the statements she gave to police immediately following the death of Christopher Alfter. For instance, defendant told investigating officers that after finishing her shower, she entered the living room, went over to her son, picked up the knife and note, and then set them down where she found them. However, the knife was discovered under the sleeping bag, and no fingerprints were found on either the knife or the note. While these inconsistencies are suspicious and do lend support to the prosecution's theory, we believe that they are insufficient, standing alone, to sustain a conviction in the complete absence of other proof demonstrating that the defendant was the person who committed the crime. We note that defendant's story did not change in any substantial way each time she gave a statement to the police. Moreover, these inconsistencies are minor when the evidence is taken as a whole, and certainly do not amount to a confession of guilt.

In this regard, the case of *People v. Lewellen* (1969), 43 Ill. 2d 74, 250 N.E.2d 651, is particularly relevant to the case at bar. In *Lewellen*, the defendant was convicted of voluntary manslaughter in the death of her husband. She gave several extremely divergent explanations of her husband's death immediately following the incident and during the trial. In reversing the conviction, the Supreme Court noted that, if the defendant's inconsistent statements were disregarded, there was little left but conjecture to establish that the death was caused by criminal conduct on her part. (43 Ill. 2d 74, 78, 250 N.E.2d 651, 654.) Virtually the same circumstances are present here, except that the inconsistencies shown in defendant's statement are not nearly as incriminating as the differing stories told by the defendant in the *Lewellen* decision.

■■ In the final analysis, we are of the opinion that the weight of the prosecution's evidence failed to overcome the basic presumption of innocence accorded the defendant as the accused in a criminal case. This presumption is not overcome by speculation, conjecture, innuendo, or by the probabilities. (See *People v. Johnson* (1964), 31 Ill. 2d 321, 323, 201 N.E.2d 367, 369.) "If a conviction is to be sustained, it must rest on the strength of the People's case and not on the weakness of the defendant's case." (*People v. Coulson* (1958), 13 Ill. 2d 290, 296, 149 N.E.2d 96, 99.) The People's case is not sufficient here. Accordingly, we reverse the judgment of the Circuit Court of Kendall County.

Reversed.

GUILD, P. J., and WOODWARD, J., concur.