(No. 25469.

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* JOHN COLLINS *et al.* Plaintiffs in Error.

*Opinion filed Dec. 16, 1940—Rehearing denied February 5, 1941.*

IRA I. SILBAR, for plaintiffs in error.

JOHN E. CASSIDY, Attorney General, J. L. BREARTON, State's Attorney, and A. B. DENNIS, for the People.

Mr. JUSTICE MURPHY delivered the opinion of the court:

Two brothers, John and Clarence Collins, negroes, aged seventeen and fourteen, respectively, were found guilty by a jury in Carroll county of the crime of murder. The pun-

ishment of John was death, that of Clarence, twenty years in prison.

Subsequent to the granting of the writ of error, there was filed in this court a suggestion of the insanity of John Collins and proof of his incarceration in the asylum for the criminal insane pursuant to an order of the circuit court of Carroll county. This court, on its own motion, ordered at the last April term, "that as to John Collins all proceedings and consideration of the cause are stayed until such time as proof of his restoration has been filed in this court. As to * * * Clarence Collins the cause will be taken at this time, the same to be without prejudice to the rights of John Collins." We now consider the cause of the latter and emphatically state that what shall be said by this court in reviewing the record and evaluating the testimony of witnesses, will not be binding upon the court, if, in the future, it must review the cause of John Collins. We say that because, in the review of the cause of Clarence Collins, we can not keep John Collins and what he said and did, entirely out of our review and statement. Our statements and conclusions set forth in this opinion are in nowise to operate to the prejudice of John Collins, if and when his cause is finally determined by this court. Why this is so will be made apparent by the opinion itself.

In 1938 and 1939, a Civilian Conservation Corps camp for negroes was maintained just north of the city of Mt. Carroll under the command of Lieutenant Paul LeMaster. The enrollees in the camp were paid on the last day of each month. On the morning of March 31, 1939, Lieutenant LeMaster had obtained from a Mt. Carroll bank, money, in the form of currency, silver and copper coins, to meet the pay-roll of that day. Between 1:15 and 1:30 o'clock in the afternoon Lieutenant LeMaster was at his desk in the office of the camp headquarters with approximately $1200 of the pay-roll in a sack before him. Two armed and masked robbers entered the office, fatally wounded him

and escaped from the camp with the money and his holstered 45-caliber automatic service pistol.

The evidence upon which the People rely is largely circumstantial and somewhat involved. Before entering into a statement thereof, a description of the area involved will be very helpful. Running north out of Mt. Carroll is State Route No. 78. Just north of the city is a creek that flows west. East of the city, its course is tortuous, but north thereof it runs practically east and west. Route No. 78 crosses the creek by a bridge; a graveled public road, immediately north thereof, runs east, parallel to what is the south property line of an old folks home. When the southeast corner of this property is reached the road runs north to the northeast corner of the home property where a lane, along the north line of the old folks home, joins the road. The road at this point turns east to what is called the Musser property; thence it runs north again for a short distance; thence east again to the southwest corner of the "CCC" camp grounds; thence north past the camp. On the Musser property, which lies between the south line of the camp grounds and the north bank of the creek is a dumping ground, extending north from the creek and used by the public and the camp; it holds old automobile bodies, tin cans and other rubbish. The camp faces the graveled public road which is its west boundary. The first north and south row of barracks is not far from this road, the entrance drive to the camp being so located that the building immediately south thereof is used as camp headquarters. There are two garage buildings in this first row that are north of the entrance drive. North of the second one is the north boundary of the camp; north of that is a field. The area across the graveled public road west of the camp is farm land, part of which is bounded on the south by the lane on the north side of the old folks home, the balance by that portion of the main road running east to the southwest corner of the camp grounds. East of those grounds

and north of the creek is farm land that is rather rough. If one goes east along the north bank of the creek he comes to a spring branch that extends north. Several hundred feet north of where this branch enters the creek is a tree with a cavity under its roots.

The robbers were noticed in the camp grounds as they came south along the west side of the garage which is just north of the entrance drive. They were carrying on their right shoulders a 2″ x 6″ plank about 8 feet long. The one in front wore blue denim pants, olive-drab monkey jacket and a gray felt hat; the face was entirely covered with a mask except for the eyes, and he was openly carrying an automatic pistol. The person at the rear end of the plank was dressed in olive-drab pants, olive-drab monkey jacket, gray felt hat and was masked, like his companion, but displayed no weapon.

The camp office, being a room 20′ x 20′, is in the west end of the headquarters building, the main entrance being a door on the west, about midway of the side. When this door was reached by the robbers they dropped the plank and entered the office. The one in front, openly armed, advanced to about the middle of the room. The inmates of the room were ordered to hold up their hands. Lieutenant LeMaster was standing by his desk which was in the northeast corner; standing by him was Charles Vincent, advisor of the camp. John Cohill, an enrollee, was at his desk in the south half of the office and about five feet from the west door. He started to rise from his chair and the robber at the west door drew a revolver and ordered Cohill to be still. The robber in the center of the room ordered LeMaster and Vincent to move to one side. The two started moving to the left toward an east door leading into the warehouse section of the building. The robber who had ordered them to move opened fire on them, fatally wounding LeMaster; as he fired the robber advanced to the desk and secured the money bag and LeMaster's pistol

and holster. Both robbers left the office and ran south along the graveled public road on the west side of the camp to where they turned west at the bend and were lost to sight because the land rises and obstructs the view.

In the endeavor to fasten the crime upon John and Clarence Collins the People produced the following evidence. John Collins was an enrollee in the camp until discharged in 1938. Both boys lived in Chicago with their mother. On March 30, 1939, by the subterfuge of the false story of having a job to pass bills in Chicago, they secured permission of their uncle to use his black Plymouth automobile the next day. On the morning of March 31, they secured the automobile and left Chicago. In the afternoon, when the sheriff of Carroll county was traveling along the public graveled road to the camp to investigate the robbery and murder, he passed the mouth of the lane on the north line of the old folks home. He saw a Plymouth automobile standing therein, which, on investigation, proved to be the automobile defendants had borrowed from their uncle. A search was instituted for the robbers, in the course of which the defendants were found hidden in the cavity beneath the tree located in the spring branch east of the camp. At the scene of capture Clarence Collins voluntarily denied shooting Lieutenant LeMaster. When captured he was wearing blunt-toed shoes and John Collins was wearing pointed shoes. The ground of the area described, at this particular time, was soft and muddy, for it had been raining. Starting from where the automobile was parked in the lane north of the old folks home the authorities charged with investigating the crime discovered a trail of shoe prints, half of them made by broad-toed shoes, half of them made by pointed-toed shoes. Both types of shoe prints were together, thereby evidencing conclusively that two persons walking together had made the trail. North of this lane was a field that had been in corn in 1938 and was at this time muddy. The trail of shoe prints traversed this field

in a northerly direction and was lost in a field covered with sod, but was picked up in a field immediately north thereof. It proceeded in a general northeasterly direction to a fence that is across the graveled public road from the fence which forms the north boundary line of the camp. Across this road, similar shoe prints were found, showing where the persons wearing the shoes had crossed the fence and entered the camp grounds just about in line with the west ends of the two garages and the headquarters building. The shoe prints were also found at the southwest corner of the first garage near a pile of boards which contained boards similar to the one carried by the robbers to the entrance of the camp office. On April 1, a witness examined the area from a point about 300 feet east of the dump to the Musser land and found the shoe prints made by broad-toed shoes in a plowed field immediately north of a fence which runs directly east from the dump. The prints were a greater distance apart than would be the ones made by a person walking normally. The shoe prints were followed in an easterly direction to the southeast corner of the field. The prints were lost in sod ground. A little farther east, on the water's edge of the north bank of the creek, the points of the broad-toed shoes and the pointed-toed shoes were found together. These shoe prints continued eastward along the north bank of the creek along the water's edge to where the spring branch joins the creek. The prints continued on across the branch until again lost in sod ground, approximately five hundred feet from where defendants had been found hidden. The shoes taken from defendants were set in many of the shoe prints in the trail from the lane north of the old folks home to the garage corner and from the point east of the dump to where the defendants were found. In each instance the particular type of shoe fitted the shoe prints perfectly. A few minutes before the robbery the owner of the cornfield north of where the Plymouth automobile was parked in the lane, saw two negro boys walking north across

the field and they were dressed in clothing similar to that worn by the robbers.

On April 1, an enrollee of the camp, while searching the dump for clues, found hidden in an old automobile body a pair of blue denim pants, two olive-drab coats and a gray felt hat. On June 18 next, another enrollee was searching the dump specifically for guns and money, as thirty-nine silver half-dollars had been found in the branch near where defendants had hidden. This enrollee found the hiding place in the west side of the dump near the north bank of the creek. The sheriff dug up a 32-caliber automatic pistol, a 38-Colt revolver, Lieutenant LeMaster's 45-caliber automatic service pistol in its holster, and $1102 in a felt hat.

From tests made by a qualified firearms expert, it was shown that four cartridge cases found in the office after the shooting were fired from the 32-caliber automatic pistol found in the dump. At the time of the robbery, a woman was fishing from the south bank of the creek at a point southeast of the west line of the camp. Around half past one or two o'clock that afternoon she looked north across the creek and saw a negro coming toward her from the northwest. He was dressed in khaki pants, wore no coat or hat. After moving about a big rock for a very short time he went around the rock and disappeared from her sight. She identified Clarence Collins as the person she saw at that time. Witnesses said the masks worn by the robbers were made from army-issue underwear such as worn by camp enrollees, two holes being cut in each shirt for eye-holes. Clarence, when searched, was wearing such a shirt.

Dr. H. M. Goff, negro camp physician, was an important witness for the People and his testimony was very damaging; counsel for defendants did not abstract the testimony of this witness. Dr. Goff testified that, while conversing with both boys on the evening of April 1, he told them he was convinced they had killed Lieutenant LeMaster and

advised them to plead guilty. Later that evening, when the defendants were separated, Clarence called for him. The two conversed about the crime and Clarence said, "Doctor, if I told the truth, my brother will burn." Clarence agreed to take the witness to where the money was buried. It was upon this that a search party was organized the following Saturday to search for the money. Search was made at the place indicated by defendant, but the money was not found. The place indicated was not near the dump where the money was found on June 18.

In denying to questioners any participation in the robbery and murder, Clarence Collins, in substance, told the following story: He was picked up by John Collins in Chicago and at the time he did not know where John had obtained the automobile; that two boys, of whose names he was not sure, were with them. To one questioner Clarence said he sat in the back seat; to another he told of being in the front seat with his brother. He said that just outside of Mt. Carroll, a big fellow, who did not have a gun, forced the two brothers out of the car because they would take no part in the contemplated robbery; that the two boys waited at a house for the robbers to return with the automobile; that on their return, the two were given some half-dollars and saw the robbers hide the balance in a brown case near the creek bank. When a Federal officer suggested to Clarence that he tell the truth he said, "I do not want to get my brother into trouble." Clarence did not testify at the trial and the story related by him, as given above, stands undenied.

The People offered in evidence what purported to be the joint, unsigned confessions of the two defendants taken before reputable witnesses,—*i. e.*, the State's attorney, his assistant, the sheriff, the chief of police of Mt. Carroll, O. M. Grove, county judge of Carroll county, and two women stenographers. The trial court had been satisfied in a preliminary hearing that the confessional statements

were freely and voluntarily given by each defendant. The defendants objected to their admission, on the ground they were obtained from them involuntarily. The special assistant State's attorney told John Collins it was his opinion John had killed LeMaster and the probable result, if he did not confess, would be to take Clarence into far deeper trouble than he was in, for if the case proceeded to trial, the People would ask the jury for the extreme penalty. The two brothers were allowed to converse privately. Thereafter, John said, "Well you have talked about Clarence, but what about giving me a break?" The assistant said no breaks can be given, but "if you wish to confess your guilt and go before the court, and ask to save your life, the office of State's attorney will keep quiet; we will throw no stone in your path in making the request for saving your own life." On this basis the confessional statement of questions and answers was obtained. Those questions primarily were concerned with the actions of John Collins.

In so far as our disposal of the case of Clarence Collins is concerned, we do not have to pass upon the question as to whether what he said in the statement was freely and voluntarily spoken. The evidence, as we have narrated it in substance, was sufficient to warrant the jury in believing, beyond all reasonable doubt, that Clarence Collins was guilty of the charge laid in the indictment, without any consideration whatever being given to the confessional statement.

His story, as it was given to different persons, is not even plausible when compared with the facts. Clarence was in Mt. Carroll about noon of March 31, for he was seen in a black Plymouth automobile that was being backed up a street. A rural mail carrier had to stop his car to prevent a collision with the Plymouth. As the latter automobile passed him, Clarence was in the front seat alongside the driver.

The trial court is charged to have erred by admitting in evidence the clothing worn by the robbers at the time of

the hold-up, the three firearms and the discharged cartridge cases and cartridges. The objection is based upon the assumption of the asserted inability of the People to connect those particular articles with the defendant as one of the perpetrators of the crime. Looking at this allegation of error, in the light of all the evidence in the case, the trial court did not err in the admission of those exhibits. *People* v. *Fontana*, 356 Ill. 461, *People* v. *Berardi*, 321 id. 47, *People* v. *Evertson*, 310 id. 397, and *People* v. *Berkman*, 307 id. 492, are cited in support of this allegation of error. Comparison of the facts of each of those cases with the facts of this case makes it quite clear why the holding in each is inapplicable here.

Lastly, it is asserted the court and the jury failed to consider the extreme youthfulness of Clarence Collins in the fixing and execution of his punishment. Clarence Collins was charged with murder, pleaded not guilty and stood trial before a jury. The law declares that, under such circumstances, the jury shall fix the punishment after a finding of guilt. It is clear the trial court can not override the statute by any change of the punishment determined by the jury. *People* v. *McWilliams*, 348 Ill. 333, is believed by the defendant to be persuasive. In that case there was a plea of guilty and a hearing was held by the court to determine if circumstances of mitigation or aggravation existed. The difference in the factual situation between that case and this one is a complete bar to the application of the holding therein to this case, where the jury has fixed the punishment. Twenty years in the penal institutions of this State, for a crime of the character established by the evidence, is not a punishment disproportionate to the offense or to the age of Clarence Collins.

The judgment of the circuit court of Carroll county, as to Clarence Collins, is affirmed. *Judgment affirmed.*